**MFA COOPERATIVE ASSOCIATION # 86, Respondent,**

v.

**Kenneth STONE, Vickie Stone and Darin Stone, Respondents,**

v.

**MFA, INCORPORATED, Appellant.**

No. 21826.

Missouri Court of Appeals, Southern District, Division One.

July 20, 1998.

Daniel D. Whitworth, Myers, Taylor and Whitworth, P.C., Webb City, for Appellant.

Chris L. Weber, Monett, for Respondents Kenneth Stone, Vickie Stone and Darin Stone.

No appearance for Respondent MFA Cooperative Association No. 86.

CROW, Judge.

Defendants, Kenneth Stone, Vickie Stone and Darin Stone, operate a dairy farm.

MFA Cooperative Association # 86 ("Co-op") sued Defendants to collect $26,936.21 allegedly due from Defendants for cattle feed, fertilizer and other farm supplies furnished Defendants by Co-op from January 1992 until August 1993.

Defendants counterclaimed, averring feed they obtained from Co-op harmed their cattle, causing milk production to drop, some cattle to die, and other cattle to be culled from the herd.

Co-op thereupon filed a third-party petition against MFA, Incorporated ("MFA") alleging the feed complained of by Defendants was manufactured by MFA, hence MFA

should indemnify Co-op for any damages assessed against Co-op in favor of Defendants.

Defendants thereafter amended their pleadings, adding a claim against MFA similar to their claim against Co-op.

When trial began, Co-op dismissed its third-party claim against MFA.

Three days of evidence produced two verdicts. In Verdict A, the jury found for Co-op on its claim against Defendants and assessed damages at $32,881.22.[1] In Verdict B (resolving Defendants' claims against Co-op and MFA), the jury assessed these percentages of fault: Co-op 20; MFA 40; Defendants 40. The jury found Defendants' damages, disregarding any fault on their part, to be $79,000.

The trial court entered judgment awarding Co-op $17,081.22 against Defendants. The judgment recites this sum is "the excess of the amount of [Co-op's] verdict against Defendants ... above the amount of [Defendants'] ... verdict against [Co-op]." On Defendants' claim against MFA, the judgment awards Defendants $31,600.[2]

MFA (alone) appeals, presenting five assignments of error. The first pertains to two exhibits used by Defendants in an effort to prove the amount they allegedly lost from decreased milk production. Those exhibits can be coherently discussed, if at all, only after a synopsis of the evidence pertinent to them.

Defendants' theory was that a product manufactured by MFA, marketed as Aurora Special Dry Cow Pellets ("ASDCP"), contained "anionic salts." Defendants bought two loads of ASDCP from Co-op, one in February 1992, the second in April 1992. Defendants fed the ASDCP to their dry cows.[3]

Defendants presented evidence that the anionic salts in the ASDCP adversely affected the dry cows, causing substandard milk

output once those cows "freshened," i.e., began producing milk. Defendants' premise was that production began to decline in August 1992 and reached a low point in June 1993. After that, production began climbing as the cows recovered, but did not return to normal until after March 1994.

To demonstrate the diminished production, Defendants relied on records from the Missouri Dairy Herd Improvement Association ("DHIA"), a member-owned organization that collects data from members and provides them statistical reports about their herds. From DHIA monthly reports about their herd, Defendants extracted a milk production figure referred to by witnesses as the "rolling herd average" ("RHA").

The RHA for July 1992 (the month before production began falling) was 16,210 pounds. In August, the RHA dropped to 16,040; by June 1993 it had sunk to 14,155. After starting to climb in July 1993, the RHA reached 15,936 in March 1994.

One exhibit used by Defendants at trial was Exhibit H, a copy of which appears at the end of this opinion. Although the record is nebulous, we deduce the handwritten figures on Exhibit H were inscribed during the testimony of Darin Stone.

The figures in the "RHA" columns on Exhibit H were taken from DHIA reports. The figures in the "No. Tested" columns on the exhibit were also taken from DHIA reports; those figures represent the number of cows tested in the months listed on the exhibit. The figures in the "Milk Price" columns on the exhibit were taken from "milk checks" received by Defendants from Mid–America Dairymen, Inc. ("Mid–Am"), the company that bought the milk Defendants' cows produced.

When Defendants' lawyer asked Darin[4] about the milk prices (the figures beneath the "Milk Price" columns on Exhibit H),

1. This sum apparently comprises the amount owed by Defendants plus interest from the date Co-op filed this suit until the date of trial.

2. Forty percent of the $79,000 which the jury found to be Defendants' damages.

3. Destitute of knowledge about dairying (and a host of other subjects), this court gleans from the

record that a dry cow is one that is not producing milk. According to the testimony of a veterinarian, the dry period varies from 40 to 75 days.

4. For brevity, this opinion henceforth refers to Darin Stone by his forename. No disrespect is intended.

MFA's lawyer—outside the hearing of the jury—registered the following objection:

"If he's going to testify off of those milk stubs,[5] that's a gross. That's not his net price, which doesn't has [sic] his hauling, Gramm–Rudman. There's a national ... milk promotion, then there's a capital retained that's on there too. Since there's nothing in there in that one[6] that talks about ... the expenses are associated with it, I've got to object to him testifying to the gross price. He can testify to the ... net price, which is ... what we're dealing with.... But if he's just going off with what [Defendants' lawyer] showed us ... that's a gross figure. That's not a net figure. And there's nothing in there that shows the discount."

To fathom the objection, it is necessary to inspect one of the "milk stubs"[7] referred to by MFA's lawyer. The "stub" for July 1992 (the month before production began falling) shows the amount of milk bought by Mid–Am from Defendants that month, the price, and the following deductions:

"285.90   NATIONAL   MILK   PRO-
MOTION
667.09   HAULING
260.16   GRAMM–RUDMAN   ASSESS-
MENT
251.52   CAPITAL RETAIN[.]"

The "stubs" for other months during the period in dispute show deductions for the same purposes in varying amounts.

Faced with the objection by MFA's lawyer, the trial court asked Defendants' lawyer how he proposed to deal with the issue. Defendants' lawyer replied: "I will ... say that there would be deductions taken off of this, that they vary."

The trial court told Defendants' lawyer: "I think between now and the time you try to argue this you and your witness need to come up with an average of the gross that is the net check." With that admonition, the trial court overruled MFA's objection.

Under questioning by Defendants' lawyer, Darin testified the prices on Exhibit H were the prices per pound of milk for the listed months, e.g., the .137 price for August 1992 meant 13.7 cents per pound. Darin's testimony continued:

"Q. Now, I think Kenny testified that there are some deductions made from your milk check automatically; is that correct?

A. There is.

Q. And what kind of deductions are those?

A. National Milk Promotion, hauling, Gramm–Rudman assessment, and capital retained.

Q. ... And those vary every month; don't they?

A. Yes.

Q. And, logically, they would come off of this figure, correct?

A. Right.

    . . . .

Q. ... We haven't figured that into that.

A. ... No, we haven't.

Q. But, logically, we could?

A. Yeah, we can."

The format of Exhibit H was conceived by Defendants' veterinarian. Through the veterinarian's testimony, Defendants presented the jury a formula for calculating the financial loss from the diminished milk production.

The veterinarian explained that each month's RHA is an average of the herd's production for the preceding twelve months. Consequently, in using Exhibit H to calculate the lost production for August 1992, the first step would be to subtract that month's RHA from the July 1992 RHA, as July 1992 was the month before production began falling.[8]

5. Before Darin testified, Kenneth Stone identified Exhibit C as a series of "milk check stub[s]" from Mid–Am. As we comprehend Exhibit C, it encompasses the period from January 1, 1992, to December 31, 1993. Exhibit C was received in evidence without objection. We divine that MFA's lawyer, in referring to "those milk stubs," meant Exhibit C.

6. Inferably, Exhibit H.

7. Footnote 5, *supra.*

8. The RHA for each month listed on Exhibit H was established by Exhibit G, another DHIA report on Defendants' herd. Exhibit G was received in evidence without objection.

The second step would be to divide the figure obtained in step one by twelve, as each month's RHA is an average of the production for the preceding twelve months.

The third step would be to multiply the figure obtained in step two by the number of cows tested in August 1992. This would establish the total pounds of milk lost through substandard production that month.

The final step would be to multiply the figure obtained in step three by the milk price (per pound) in August 1992.

The same method would be used to calculate the financial loss for each succeeding month.

Following Darin's testimony, Defendants presented no calculations regarding the four recurring monthly deductions on the "milk stubs" [9] for the months in dispute.

Although the record is murky, we deduce that during final argument, Defendants' lawyer used two exhibits to illustrate Defendants' financial loss from decreased milk production. One was Exhibit H; the other is identified as "Exhibit Hw/# s." We suspect the abbreviation "w/# s" may stand for "with numbers." A copy of Exhibit Hw/# s appears at the end of this opinion.

When the two exhibits are compared, it is evident they are identical in format. The exhibits differ in that Exhibit Hw/# s displays some typewritten figures that appear on Exhibit H in handwriting (figures in the "RHA," "No. Tested," and "Milk Price" columns); additionally, Exhibit Hw/# s displays typewritten figures that do not appear at all on Exhibit H (figures in the "Milk Lost," "Total Lost," and "Total Value" columns).

It is difficult to precisely envision what occurred when Defendants' lawyer displayed the exhibits, as there are numerous "inaudible" notations in the transcript. As best as we can reconstruct the incident, MFA's lawyer objected to Exhibit Hw/# s because it did not show the amounts by which the "Total Value" of the lost milk would have been reduced by the four recurring deductions on the "milk stubs."

The trial court remarked: "My recollection was that yesterday [Defendants' lawyer] presented Darin Stone, gave the milk check numbers and filled them in on [Exhibit H] .... it was elicited that those were not net pay numbers, that they [were] gross pay numbers from which there were certain deductions...."

MFA's lawyer asserted: "[W]e understood it was going to be cleared up before this exhibit[ [10]] was going to be offered. And that was the reason we let him go ahead and testify about what the milk prices were."

The trial court told Defendants' lawyer: "You're entitled to make your lost milk argument, but I think [MFA's] counsel is right ... there is a misleading element to this exhibit."

After further dialogue between the trial court and counsel, we glean from the transcript that the trial court allowed Defendants' lawyer to display Exhibit Hw/# s but required him to cover the "Total Value" columns and the three totals to their right. We recognize the transcript may be susceptible to a different interpretation. This is the best we can do.

Defendants' lawyer resumed his argument. When he concluded, MFA's lawyer requested a "withdrawal instruction on the issue of lost milk." MFA's lawyer argued: "Exhibit H is incomplete. [The jurors] have no knowledge of how much cost is involved. So, therefore, their calculation will either be in error or will be the gross amount, which is not the measure of damages."

The trial court denied the request for a withdrawal instruction. The court explained: "[T]he jurors have been adequately informed of the testimony of ... Darin ... as to the fact that there is a net milk price which can readily be calculated from exhibits which are in evidence."

■ MFA's first point:

"The trial court erred in admitting incompetent evidence over objection of [MFA] by allowing [Defendants] to continue to utilize and display to the jury Exhibit

9. Footnote 5, *supra*.

10. Inferably, Exhibit Hw/# s.

H and Argument Exhibit H–W/HS [sic] which dealt with alleged loss of milk production in that said exhibit [sic] reflected only the gross sales price of said milk as opposed to the net sales price which is the correct measure of damages."

MFA cites *Coonis v. Rogers*, 429 S.W.2d 709 (Mo.1968), which explains:

"In evaluating the sufficiency of evidence to sustain awards of damages for loss of business profits the appellate courts of this state have made stringent requirements, refusing to permit speculation as to probable or expected profits, and requiring a substantial basis for such awards.... Loss from the interruption of an established business may be recovered 'where the plaintiff makes it reasonably certain by competent proof what was the amount of his profits, but proof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable.'

... The cost and expense of operation, including depreciation (wear and tear), is a considerable item and in a suit for loss of profits is an essential item in the proof of damages."

*Id.* at 713–14 (citations omitted).

Another case cited by MFA, *Meridian Enterprises Corp. v. KCBS, Inc.*, 910 S.W.2d 329, 332 (Mo.App. E.D.1995), relies on *Coonis* for the proposition that in an action for loss of profits, cost and expense of operation constitute an essential element in proof of damages.

There is a subtle difference between the instant case and *Coonis* and *Meridian*. In the two latter cases, the claimants asserted the adverse parties wrongfully diverted customers from the claimants, thereby causing the claimants to lose profits they would have earned had the customers remained undisturbed. Obviously, in establishing the alleged lost profits, it was essential for the claimants to demonstrate not only what they would have been paid by the alienated customers, but also what it would have cost the claimants to provide the products and services to those customers.

Here, the hypothesis of Defendants' claim against MFA was that the milk produced by Defendants' herd diminished because of the ASDCP. Nothing in the record suggests Defendants' operating costs during the period in dispute would have been higher had the herd produced the customary amount of milk. Said another way, there was no evidence that it would have cost Defendants any more to produce the "lost milk" plus the actual milk than it did to produce the actual milk alone.

Consequently, the jurors could have reasonably concluded that the profits Defendants lost could be readily ascertained from the evidence adduced at trial. The first step would be to calculate the amount Mid–Am would have paid for the lost milk during the period in dispute. This could be done by using the formula presented by Defendants' veterinarian (mentioned earlier). The next step would be to figure out the amount Mid–Am would have deducted from the sum calculated in step one. As we have seen, there were four recurring deductions. Exhibit C [11] shows the actual amounts of the four deductions each month throughout the period in dispute.

During their deliberations, the jurors asked for, and were provided, various exhibits including Exhibits A,[12] C, G [13] and H. Thus, the jurors had all the data needed to calculate the aggregate amount Mid–Am would have owed Defendants for the lost milk and the aggregate deductions Mid–Am would have made from the amount owed. In that regard, we note the four deductions shown on each monthly "milk check stub" (Exhibit C) were for all the milk Mid–Am bought from Defendants during such month. That is, the four deductions for July 1992 (set forth earlier in this opinion) were based on

**11.** Footnote 5, *supra*.

**12.** Exhibit A, another DHIA report on Defendants' herd, shows, *inter alia*, the number of cows tested each month for the months listed on

Exhibits H and Hw/# s. Exhibit A was received in evidence without objection.

**13.** Footnote 8, *supra*.

the total milk Mid–Am purchased from Defendants that month. Obviously, the deductions that would have been attributable to the lost milk would have been only a small fraction of the aggregate deductions shown on the "stubs" during the months in dispute.

While Defendants would have saved the jurors a substantial chore in mathematics had Defendants themselves calculated their net loss from substandard milk production during the period in dispute, the jurors had all the necessary evidence from which they could—and presumably did—make that calculation.

In *Refrigeration Industries, Inc. v. Nemmers*, 880 S.W.2d 912 (Mo.App. W.D.1994), a case cited by MFA, a party claimed loss of anticipated profits because the adverse party diverted clients to a competitor. The appellate court said:

> "While the plaintiff is required to prove with certainty the *fact* of damage, the same degree of certainty is not required with regard to the *amount* of damages.... All that is required by Missouri courts is that the amount of the estimated lost profits be supported by the best evidence available."

*Id.* at 920 (emphasis in original; citations omitted).

MFA does not allege Defendants failed to present the best evidence available. MFA's complaint, as we discern it, is that the trial court erred in allowing the jurors to calculate Defendants' lost profits from the exhibits in evidence and the formula presented by Defendants' veterinarian. MFA maintains the trial court should have required Defendants to do the arithmetic themselves and present their calculations to the jurors.

While we are astonished that Defendants consigned to the jurors the onerous burden of tediously calculating Defendants' damages from substandard milk production during the period in dispute, we find nothing in the cases cited by MFA indicating the trial court committed reversible error in condoning that procedure. MFA's first point is denied.

We do not imply Defendants' evidence supported a finding that their damages from substandard milk production during the period in dispute totalled $79,000 (the amount the jurors assessed as Defendants' total damages from feeding their herd ASDCP). Substandard·milk production was only one of the ways Defendants claimed they were damaged.

Another item of damage, according to Defendants, was premature culling of cows from the herd. Darin explained that culling is a process where a cow is removed from the herd because her health declines or her milk production diminishes. Culled cows are sold for slaughter. According to Darin, during the period in dispute the fair market value of a Holstein[14] milking cow in good condition was $1,450, while the average price Defendants received from a culled cow during that period was $614.

Darin avowed that during the period in dispute, Defendants culled 180 cows, whereas the normal number would have been 100 at most. Defendants' veterinarian pointed out that when a cow was culled prematurely, Defendants lost the calves the cow would have produced had she remained in the herd a normal period of time.

From the evidence in the two preceding paragraphs, the jurors could have reasonably found the ASDCP damaged Defendants in that Defendants lost (a) the value the prematurely culled cows would have had if they had remained healthy (minus their slaughter value), and (b) the value of the calves those cows would have produced had they not been prematurely culled.

Defendants claimed they were also damaged because an unusually high number of cows died during the period in dispute. Darin testified there were nine more deaths than normal during that period. Defendants' veterinarian attributed the increased deaths to the ASDCP. Darin explained Defendants received nothing for a dead cow.

Consequently, in assessing Defendants' damages at $79,000, the jurors could have reasonably found Defendants were damaged by not only substandard milk production during the period in dispute, but also by premature culling of cows and an abnormally high number of cow deaths during that period.

14. Defendants have a Holstein herd.

■ Having identified the components of Defendants' damages, we address MFA's second point, which reads:

"The trial court erred in failing to give Appellant's Instruction No. C (MAI 34.02) as a withdrawal instruction regarding the issue of damages and loss due to prematurely culled cows in that Respondents Stone failed to provide competent evidence regarding the proper measure of damages."

Rule 84.04(d) [15] reads:

"The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous...."

The purpose of Rule 84.04(d) and the necessity of obeying it are exhaustively discussed in *Thummel v. King*, 570 S.W.2d 679, 684–88 (Mo. banc 1978).

In *Brown v. Mercantile Bank of Poplar Bluff*, 820 S.W.2d 327, 339[21] (Mo.App. S.D. 1991), an appellant's point relied on read:

"The court erred in awarding actual damages because the only proof of such damages was speculative, and without foundation."

This court held the point violated Rule 84.04(d), as the point failed to state wherein and why the challenged ruling was erroneous. *Id.* Consequently, the point presented nothing for review. *Id.*

MFA's second point is similarly flawed. The point predicates error on the trial court's failure to give a withdrawal instruction on "the issue of damages and loss due to prematurely culled cows." The point hypothesizes that Defendants "failed to provide competent evidence regarding the proper measure of damages."

The point yields no clue as to what evidence Defendants should have presented to support an award for losses due to prematurely culled cows and affords no hint as to wherein or why the evidence Defendants did present (noted briefly earlier in this opinion) was insufficient to support such an award. Applying *Brown*, 820 S.W.2d at 339[21], we

hold MFA's second point presents nothing for review. *Cf. Nishwitz v. Blosser*, 850 S.W.2d 119, 121–22[1] (Mo.App. E.D.1993).

■ MFA's third point:

"The trial court erred in giving Instruction No. 12 as a verdict director to the jury as opposed to Instruction No. B, as offered by Appellant, which was refused, in that Instruction No. 12 failed to instruct the jury on the issue of Appellant's duty to Defendant [sic]."

In *McCutcheon v. Cape Mobile Home Mart, Inc.*, 796 S.W.2d 901, 903–04 (Mo.App. E.D.1990), a point relied on read:

"The Trial Court erred in giving instruction No. 10 on damages, as submitted by Plaintiffs, in that said instructions [sic], not in MAI, was contrary to the law under the evidence."

The appellate court held the point did not comply with Rule 84.04(d) in that the point did not state wherein and why the instruction was contrary to the law under the evidence. *Id.*

That is likewise true of MFA's third point. The point fails to set forth what duty MFA owed Defendants; the point provides no inkling as to wherein Instruction No. 12 failed to instruct the jury on that subject; the point surrenders no intimation as to wherein Instruction No. B adequately covered the matter. Applying *McCutcheon*, we hold MFA's third point presents nothing for review. *Cf. Heins v. Murphy*, 610 S.W.2d 15, 17–18 (Mo. App. E.D.1980).

■ MFA's fourth point:

"The trial court erred in failing to give Appellant's Instruction No. C (MAI 34.02) as a withdrawal instruction regarding the issue of damages and loss of prematurely culled cows in that Respondents Stone failed to provide competent evidence regarding the fair market value of the culled cattle."

The above point is identical to MFA's second point except that instead of asserting Defendants failed to provide competent evidence regarding "the proper measure of

15. References to rules are to Missouri Rules of  Civil Procedure (1998).

damages," the above point avers Defendants failed to provide competent evidence regarding "the fair market value of the culled cattle." The point fails to enlighten us as to wherein or why the evidence Defendants presented was incompetent to establish the fair market value of the culled cattle. Consistent with our holding on MFA's second point, we hold MFA's fourth point presents nothing for review. *Cf. Nishwitz*, 850 S.W.2d at 121–22[1].

■ MFA's fifth—and final—point:

"The trial court erred in failing to sustain Appellant's motions for directed verdict in that Respondents Stone failed to make a submissible case on the issue of causation between anionic salts and the complained of damages through their expert witnesses, Dr. David Prigel and Dr. David Byers."

In *Barber v. M.F.A. Milling Co.*, 536 S.W.2d 208, 211[13] (Mo.App.1976), a point relied on asserted "there was no substantial evidence to support the amount of the verdict and the same necessarily was the result of speculation and conjecture." The appellate court declined to review the complaint, emphasizing that the point failed to set forth wherein there was no substantial evidence to support the amount of the verdict or why the verdict was the result of speculation and conjecture. *Id.*

MFA's fifth point, like the point in *Barber*, furnishes no explanation as to wherein or why the testimony of witnesses Prigel and Byers failed to make a submissible case on the issue of causation. Applying *Barber*, we hold MFA's fifth point presents nothing for review.

Although MFA's second, third, fourth and fifth points are nullities, we are mindful that Rule 84.13(c) empowers us to consider plain errors affecting substantial rights if manifest injustice or miscarriage of justice resulted therefrom. *Ex gratia* review under that standard reveals no basis for appellate relief.

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.

## POUNDS OF MILK LOST

### FIVE MONTHS INTO MFA'S FEEDING PROGRAM, MILK DECLINED AS FOLLOWS:

Sheet1

| DATE | RHA | DATE | RHA | Milk Lost No. Tested | Total Lost | Milk Price | Total Value |
|---|---|---|---|---|---|---|---|
| July '92 | 14,210 | Aug.'92 | 16040 | 256 | | .137 | |
| July '92 | | Sept.'92 | 15884 | 278 | | .137 | |
| July '92 | | Oct.'92 | 15700 | 269 | | .134 | |
| July '92 | | Nov.'92 | 15544 | 269 | | .134 | |
| July '92 | | Dec.'92 | 15344 | 263 | | .130 | |
| July '92 | | Jan.'93 | 15123 | 263 | | .129 | |
| July '92 | | Feb.'93 | 14903 | 251 | | .126 | |
| July '92 | | Mar.'93 | 14624 | 247 | | .122 | |
| July '92 | | Apr.'93 | 143p2 | 260 | | .124 | |
| July '92 | | May '93 | 14147 | 268 | | .127 | |
| July '92 | | June '93 | 14155 | 270 | | .127 | |
| | | | | 265 | | | |
| | | | | | | Total | |

### MILK LOST WHILE THE COWS WERE RECOVERING

| DATE | RHA | DATE | RHA | Milk Lost No. Tested | Total Lost | Milk Price | Total Value |
|---|---|---|---|---|---|---|---|
| July '92 | 14,210 | July '93 | 14177 | 250 | | .127 | |
| July '92 | | Aug. '93 | 14248 | 242 | | 12.2 | |
| July '92 | | Sept.'93 | 14451 | 227 | | .137 | |
| July '92 | | Oct. '93 | 14671 | 237 | | .131 | |
| July '92 | | Nov. '93 | 14982 | 230 | | .136 | |
| July '92 | | Dec. '93 | 15289 | 233 | | .134 | |
| July '92 | | Jan. '94 | | | | | |
| July '92 | | Feb. '94 | | | | | al |
| July '92 | | Mar. '94 | | | | | |
| | | | | | | Grand Total | |

DEFENDANT'S EXHIBIT

## POUNDS OF MILK LOST

**FIVE MONTHS INTO MFA'S FEEDING PROGRAM, MILK DECLINED AS FOLLOWS:**

Sheet1

| DATE | RHA | DATE | RHA | Milk Lost No. Tested | Total Lost | Milk Price | Total Value |
|------|-----|------|-----|----------------------|------------|------------|-------------|
| July '92 | 16210 | Aug.'92 | 16040 | 256 | | .137 | |
| | | Sept.'92 | 15844 | 278 | | .134 | |
| | | Oct.'92 | 15700 | 269 | | .136 | |
| | | Nov.'92 | 15544 | 267 | | .134 | |
| | | Dec.'92 | 15344 | 263 | | .130 | |
| | | Jan.'93 | 15123 | 251 | | .129 | |
| | | Feb.'93 | 14903 | 247 | | .12? | |
| | | Mar.'93 | 14624 | 240 | | .122 | |
| | | Apr.'93 | 14302 | 258 | | .124 | |
| | | May '93 | 14107 | 270 | | .127 | |
| | | June '93 | 14155 | 265 | | .127 | |

Total

**MILK LOST WHILE THE COWS WERE RECOVERING**

| DATE | RHA | DATE | RHA | Milk Lost No. Tested | Total Lost | Milk Price | Total Value |
|------|-----|------|-----|----------------------|------------|------------|-------------|
| July '92 | 14210 | July '93 | 14171 | 250 | | .127 | |
| | | Aug. '93 | 14240 | 248 | | .12.2 | |
| | | Sept.'93 | 14431 | 221 | | .127 | |
| | | Oct. '93 | 14671 | 297 | | .131 | |
| | | Nov. '93 | 14962 | 230 | | .136 | |
| | | Dec. '93 | 15289 | 213 | | .134 | |
| | | Jan. '94 | | | | | |
| | | Feb. '94 | | | | | |
| | | Mar. '94 | | | | | |

al

Grand Total

DEFENDANT'S EXHIBIT
H